IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ARMIN WAND, III,

              Petitioner,                   OPINION AND ORDER

   v.

GARY BOUGHTON, Warden,                18-cv-520-slc
Wisconsin Secure Prison Facility,

              Respondent.

---

     Armin Wand III has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons stated in this order, the petition is denied.

     In the early morning hours of September 7, 2012, a fire ravaged Wand's home, killing three of his sons and causing severe burns to his pregnant wife, who later lost the fetus. Wand, who was home at the time, escaped virtually unharmed. Based on Wand's activities during and after the fire as described by witnesses, investigators began to suspect that Wand and his brother, Jeremy Wand, had started the fire. After lengthy interviews with investigators on September 7, 8, and 9, 2012, Wand–who has a mild intellectual impairment–ultimately confessed that he had started the fire in the hopes of killing his family and collecting about $150,000 in life insurance proceeds. In response to Wand's pretrial motions to suppress, the circuit court held that Wand's statements on September 8 had been coerced by the investigators' promises of leniency combined with Wand's characteristics, and it ruled that Wand's statements on September 9 were voluntary and untainted by any prior coercion.

     Wand subsequently entered guilty pleas to intentional homicide charges pursuant to a plea agreement, and the court sentenced him to consecutive life sentences. Wand later moved to withdraw his plea, arguing that he had new evidencing showing that his post-arrest statements

were involuntary and unreliable.  After the circuit court denied the motion without a hearing, Wand appealed, challenging the court's original suppression ruling and its denial of his motion for plea withdrawal.  The Wisconsin Court of Appeals rejected Wand's arguments and affirmed his conviction.  The Wisconsin Supreme Court denied Wand's petition for review.

Having exhausted his state court remedies, Wand now seeks federal habeas relief on the ground that his confession was coerced and is unreliable.  As explained below, Wand is not entitled to this relief.

FACTS

**A.  Background**

The facts are not in dispute:

At 3:10 a.m. on September 7, 2012, a fire broke out at the Wand family's home in Argyle, Wisconsin, where Wand lived with his pregnant wife, Sharon, and four young children: Allen, age 7; Jeffrey, age 5; Joseph, age 3; and Jessica, age 2.  All three of Wand's sons were killed in the fire, as was Sharon's fetus.  Sharon suffered severe burns.  Wand and his daughter, Jessica, were unharmed.

From their investigation at the scene and eyewitness statements, investigators began to suspect that Wand and his brother Jeremy had set the fire.  On September 7 and September 8, 2012, Special Agents from the Wisconsin Department of Justice's Division of Criminal Investigation (DCI) interviewed Wand in a conference room near the University of Wisconsin Hospital's burn unit, where Sharon was being treated.  A third interview with Wand took place on September 9 at the Lafayette County Jail.  During the September 8 and 9 interviews, both of which were recorded, Wand admitted his involvement in setting the fire.

2

Special Agents James Sielehr and Brad Montgomery conducted the September 8 interview.  During the interview, Wand said it was Jeremy's idea to start the fire, they did it in the hopes of getting insurance proceeds to help pay for Jeremy's lawyer in an unrelated case, and that Jeremy was supposed to wake Sharon and the kids up after the fire started.  The interview ended when the agents read Wand his *Miranda* warnings and placed him under arrest, at which point Wand said he didn't want to talk anymore.  However, Wand attempted to continue to talk with the agents, who responded by clarifying that if he wanted to talk with them further it would have to be at another time and location.  The agents gave Wand their business cards and made arrangements for his transport to the Lafayette County Jail.

While waiting for the transport, the agents made the following two statements to Wand:

> (1) Montgomery said, referring to Jeremy Wand, that it was "kind of strange that you [Armin] (came) in the night of the fire buddy buddy with the guy . . . that you know just murdered your family . . . Well, just think about that."

> (2) Either Montgomery or Sielehr reported that Jeremy had told law enforcement that Wand had kissed someone other than his wife, Sharon.

The next morning, on September 9, Wand placed calls to both Sielehr's and Montgomery's cell phones from the jail, but neither agent answered.  That afternoon, Special Agent Lourdes Fernandez went to the jail to visit Wand at Sielehr's request.  Fernandez was accompanied by Special Agent Michael Reimer.

The two agents met with Wand in an interview room at the jail.  Wand told them that Sielehr and Montgomery had advised him that if he wished to talk to them further, he could call them, and that was why he had called the agents that morning.  Fernandez and Reimer read Wand his *Miranda* rights; after reading each right they asked Wand if he understood, and he

confirmed that he did.  The agents then asked Wand to tell them in his own words what he understood his rights to be.  After confirming that Wand understood his rights and was willing to answer questions or make a statement, the agents had Wand sign his name on a waiver of rights form, which occurred at 2:29 p.m.

Reimer asked Wand why he had called Sielehr and Montgomery.  Wand responded that he wanted to talk about the comments that Montgomery had made after the interview the day before.  Wand said it was not true that he had kissed someone other than his wife, and he explained that he was walking with Jeremy at the hospital because Wand could not see without his glasses.  After covering those topics, Reimer asked Wand if the agents could ask him some other questions, and Wand agreed.

Reimer began by asking Wand if he understood the difference between right and wrong, and asked Wand to give an example of something that would be wrong.  Wand replied that "the fire was wrong."  When asked to clarify what he meant by that, Wand said that it was wrong for him and Jeremy to "take part in" the fire.  Fernandez then told Wand that "sometimes good people make bad decisions" and that this was Wand's chance to own up to his decision and tell them what happened.  Reimer told Wand that Jeremy was at the jail and had been talking with investigators, that Jeremy had "done the right thing," and that the investigators understood that "mistakes were made."  Reimer told Wand that he didn't know if Wand was a bad person who wanted people to die, or if things just "got out of hand."  Wand responded that he didn't want the boys to die or his wife to be in the burn unit.  Reimer replied that, if it was okay with Wand, they wanted to start over from the beginning and have Wand tell them the truth about what happened.

4

Wand agreed.  He explained that he and Jeremy had set fire to the house because Jeremy needed money for a lawyer and Wand was struggling financially.  Wand detailed for the agents his income, his debts, and his monthly bills, explaining that he often had to pay less than the full amount due each month.  Wand told the agents his electricity was due to be shut off the following day unless he paid $430, and that he was supposed to pay $327 to his cell phone carrier by the 8th.  Wand said that his financial situation had been bad for about six months.  The agents asked Wand how the fire had been started and what he had done before and after.

The interview ended around 9:00 p.m.  Wand was provided with three breaks during the interview.  At one point, when the agents challenged Wand's claim that the fire had been started with nothing more than a cigarette lighter and paper, Wand reported that he had grabbed a gas can from the garage and poured it on the fire.  When the agents questioned how Wand could have done this without Wand suffering any burns other than some singed hair, Wand acknowledged that he had lied about the gas can because the agents didn't seem to believe him about how the fire got started.

After the agents admonished Ward that all they wanted was the truth, Wand reverted to his earlier claim that he had been sleeping when the fire broke out and that Jeremy was never there.  The agents responded that they knew that wasn't true because they had talked to Jeremy, who had admitted his involvement.  They pressed Wand to tell the truth.  Wand then implicated himself and his brother in setting the fires.  Towards the end of this interview, Wand admitted that he had intentionally set the fire in order to collect on his wife and children's life insurance policies and to put an end to his financial struggles.

The State charged Wand with three counts of first-degree intentional homicide, three counts of attempted first-degree intentional homicide, and one count of arson, later adding a charge of first-degree intentional homicide of an unborn child.

## B. State Court Proceedings

In a pretrial motion, Wand moved to suppress his September 8 and 9 statements as involuntary. (Wand conceded that the statements he had provided on September 7 were voluntary.) The circuit court held an evidentiary hearing at which Sielehr, Montgomery, and Fernandez testified, as did several other law enforcement witnesses.

Wand presented his own testimony, along with testimony from Dr. Kent Berney, a psychologist. Berney testified that he had examined Wand and administered a number of tests to evaluate his mental functioning. From those test scores, Berney found that Wand had an IQ of 67, indicating that he was mildly mentally retarded. Berney also found that Wand had limited deductive reasoning ability. Berney offered his opinion that Wand's low IQ, challenged reasoning skills, and "compliant" personality style, along with the fact that he had poor vision and was without his glasses when questioned, "substantially compromised . . . his ability to make a rational, informed decision regarding whether to proceed with the interrogation." Berney acknowledged, however, that he had not listened to the recordings of the agents' interviews with Wand.

The circuit court found that Wand's September 8 statement was involuntary and should be suppressed. Tr. of Oral Ruling, dkt. 20-17, at 39-50. The court found that the agents had made a number of statements implying that they had authority to ensure that Wand would face

6

lesser charges if he confessed.  These statements, made to a suspect with physical and mental limitations, were coercive.  In so finding, the court expressly considered Wand's characteristics, noting his age (32), low IQ, prior contacts with law enforcement, ability to maintain a household and manage his family's finances, stuttering, and poor eyesight.  The court also considered the specific statements asked by Sielehr and Montgomery, and the fact that Wand had reportedly not appeared "stressed" during the September 8 interview.

The court denied Wand's motion to suppress his September 9 statement.  The court found that the nature of the questions asked by the agents during this interrogation were "entirely different" from the preceding day's interview: the agents were not coercive and they made no promises of leniency.  The court then found that the two interviews were sufficiently separated and attenuated that any "taint" from the first interview had dissipated by the time the agents returned to interview Wand on September 9.

The court noted that Sielehr and Montgomery had made statements to Wand after he had invoked his right to remain silent on September 8, but the court found the statements to be merely "a couple of comments," not questions.  Moreover, found the court, the agents did nothing improper when they gave Wand their cards and told him to call if he wanted to talk.  By the time of the September 9 interview, found the court, 16 hours had elapsed, Wand had been moved to the jail, he had been fed and had time to rest, he had time to think about his actions, and he initiated the contact with the agents.  Furthermore, Wand validly waived his *Miranda* rights before making any statements on September 9.  *Id*. at 52-53.

Wand later pleaded guilty to six counts: three counts of first-degree intentional homicide, one count of attempted first-degree intentional homicide, one count of arson, and one count of

felony murder.  The court sentenced him to consecutive sentences of life imprisonment without the possibility of release on extended supervision on the homicide counts, and to shorter, consecutive and concurrent sentences on the other crimes.

After sentencing, Wand moved to withdraw his guilty plea on the ground that his statements to the agents had been coerced and were  unreliable.  In support, Wand submitted reports from: (1) Dr. Lawrence White, professor of Psychology and Legal Studies at Beloit College; (2) Dr. David Thompson,  a psychologist who evaluated Wand; and (3) R. Paul Bieber, a certified fire and explosion investigator.  However, Wand did not submit a sworn affidavit declaring his innocence or claiming to have made a false confession.

In his report, Dr. Thompson wrote that Wand had a long history of "developmental motor, speech, cognitive, and visual problems," and that [these] personality characteristics "may have made him very susceptible to inappropriate interrogation techniques."  Dr. White reviewed the recordings of Wand's confessions, from which he found "many reasons to be concerned about the reliability of Mr. Wand's inculpatory statements."  Specifically, Dr. White identified certain questioning that he opined showed that the agents "actively shaped" the account provided by Wand, and other questioning that he opined generally reflected "standard Reid School techniques: confrontation, minimization, implied leniency and theme development."  In Dr. White's opinion, Wand's low intelligence, compliant personality, the number and length of interviews to which he was subject after the fire, and his lack of sleep, combined with the interrogation techniques used by the agents on September 9, led to a confession that was "psychologically coerced."  Bieber submitted a  report in which he concluded that the origin and cause of the fire were undetermined, and he criticized as premature, incorrect, and insufficiently

8

substantiated the State expert's conclusion that the fire resulted from an intentional human act. Wand argued that these three expert reports constituted "newly discovered evidence" that warranted allowing him to set aside his guilty plea.

The circuit court disagreed.  Finding that the new reports were simply "new opinion[s] based on old facts" that were previously available, the court denied Wand's motion without an evidentiary hearing.

Wand appealed, arguing that: (1) the circuit court wrongly denied his pre-plea motion to suppress his statements made to the agents on September 9, 2012; and (2) the circuit court erred in denying his post-conviction motion to withdraw his pleas without holding an evidentiary hearing.  Specifically, with respect to the September 9 statements, Wand argued that the circuit court should have suppressed his statements because:  (1) all four agents failed to honor his September 8 invocation of his right to remain silent; (2) the taint from Sielehr's and Montgomery's coercive tactics on September 8 had not been attenuated by the time of the September 9 interview; and (3) the second two agents' tactics on September 9 were coercive, given Wand's personal characteristics.   The Wisconsin Court of Appeals rejected these arguments and affirmed Wand's conviction.  The Wisconsin Supreme Court subsequently denied Wand's petition for review.  (I address the court of appeals' rulings in more detail below.)

## OPINION

Wand challenges the admissibility of his September 9, 2012 statement on the same grounds he raised in his state appeal.  In addition, Wand repeats his argument, raised in his state court postconviction motion, that this statement should have been suppressed because it was "unreliable."

A. **Standard of Review**

Wand's ability to obtain relief from this court is governed by the Antiterrorism and Effective Death Penalty Act of 1996, which commands federal courts to accord significant deference to state court adjudications of federal constitutional claims. Specifically, under 28 U.S.C. § 2254(d), this court cannot overturn Wand's conviction unless the state courts' adjudication of his claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The decision federal courts look to is the "last reasoned state–court decision" to decide the merits of the case, even if the state's supreme court then denied discretionary review. *Johnson v. Williams*, 568 U.S. 289 (2013). In this case, then, the court must examine the decision by Wisconsin Court of Appeals that Wand's confession on September 9, 2012 was voluntary.

It is not enough for Wand to show that the Wisconsin courts applied the law incorrectly; rather, he must show that they did so *unreasonably*, which is a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007); *Williams v. Taylor*, 529 U.S. 362, 410 (2000). The standard outlined in § 2254(d)(1) is exacting and "highly deferential," *Burt v. Titlow*, 571 U.S. 12, 18 (2013), demanding that state courts be given the benefit of the doubt. To prevail, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562

U.S. 86, 103 (2011).  Put another way, so long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable, the court must deny the petition. *See Woods v. Etherton*, ___ U.S. ___, 136 S. Ct. 1149, 1152 (2016).

Review of state court factual findings under AEDPA is similarly deferential. Under § 2254(d)(2), federal courts cannot declare "state–court factual determinations . . . unreasonable merely because [we] would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (internal quotation marks and citation omitted).  AEDPA does not permit federal courts to "supersede the trial court's . . . determination" if a review of the record shows only that "[r]easonable minds . . . might disagree about the finding in question." *Id*. (internal quotations and citations omitted).  But again, "deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief." *Id*. (internal quotations and citations omitted).

## B.  Federal Law Governing Admissibility of Confessions

Clearly established federal law on the admissibility of a defendant's statement in a criminal trial provides that:

> The Due Process Clause of the Fourteenth Amendment forbids the admission of an involuntary confession in evidence in a criminal prosecution. *Miller v. Fenton*, 474 U.S. 104, 109 (1985). In deciding whether a confession was voluntary, courts assess "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (collecting relevant factors). The purpose of this test is to determine whether "the defendant's will was in fact overborne." *Miller*, 474 U.S. at 116.

11

*Dassey v. Dittman*, 877 F.3d 297, 303-04 (7th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 2677 (2018).

Apart from prohibitions on physical coercion, the Supreme Court has not established a "comprehensive set of hard rules" governing voluntariness. *Id.* However, as outlined by the *Dassey* court, some specific requirements exist. "First, a person arguing his confession was involuntary must show that the police engaged in coercive practices." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 164–65 (1986)). Physically abusive interrogation tactics are coercive per se, and the Court "has condemned tactics designed to exhaust suspects physically and mentally," such as long interrogation sessions or prolonged detention paired with repeated but relatively short questioning. *Id.* (citations omitted). However, the Court "has not found that police tactics not involving physical or mental exhaustion taken alone were sufficient to show involuntariness." *Id.* (citing examples).

Second, in assessing voluntariness, courts must weigh the tactics and setting of the interrogation alongside any particular vulnerabilities of the suspect. *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). "Relevant factors include the suspect's age, intelligence, and education, as well as his familiarity with the criminal justice system." *Id.* (citations omitted).

Because the voluntariness inquiry is a general standard, Wand faces a high burden in obtaining federal habeas relief. Although even a general standard like voluntariness could be applied in an unreasonable manner, *Panetti v. Quarterman,* 551 U.S. 930, 953 (2007), application of general rules "can demand a substantial element of judgment," *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "The more general the rule, the more leeway courts have in reaching outcomes in case–by–case determinations." *Id.* (upholding state court *Miranda* conclusion where factors pointed in opposite directions).

12

Against this backdrop, I will review Wand's claims:

## C. Agents' Comments after Wand Invoked His Right to Silence on September 8

Wand first argues that his September 9, 2012 confession was involuntary because Agents Sielehr and Montgomery failed to honor Wand's invocation of his right to silence when, after *Mirandizing* him and placing him under arrest, they: (1) told Wand that Jeremy had said that Wand had kissed someone other than his wife; and (2) made comments about Wand's friendly behavior towards his brother.  Wand asserts that the agents made their closing comments "with the intent that Armin stew over them," and that these comments influenced Wand to talk to Agents Fernandez and Reimer the following day.  Br. in Supp., dkt. 25, at 29.

Addressing this argument on direct appeal, the Wisconsin Court of Appeals agreed with Wand that the agents wanted him to "stew" over their comments, but found that fact "beside the point." *Wand*, 2016 WI App 80 ¶ 20.  Citing *State v. Hambly*, 2008 WI 10, ¶¶ 46-47, 307 Wis. 2d 98, 745 N.W. 2d 48, the court observed that "[c]omments offered by an officer that might prompt thoughts by a suspect do not necessarily constitute the "'functional equivalent of express questioning' . . . 'likely to elicit an incriminating response.'" *Id*.  The state court of appeals then explained that it was not considering the argument further because "Wand neither develops any argument that these comments were the functional equivalent of express questioning, nor does he develop any other theory as to why the comments violated his rights[.]" *Id*.

The Wisconsin Court of Appeals did not unreasonably apply clearly established federal law or make an unreasonable factual determination in reaching this conclusion.  As the court

13

correctly observed, to show that he was subject to "interrogation" after invoking his right to remain silent, Wand had to show either that he was subject to express questioning or to "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).  "Subtle compulsion" by the agents was not enough.  *Id.* at 303.  In *Innis*, the Court rejected Innis's claim that interrogation had taken place when two officers conversed in front of him about their desire to locate a gun Innis had supposedly used and discarded, lest any students from a nearby school for handicapped children "find a weapon with shells and . . . hurt themselves."  The officers' statements prompted Innis to interrupt and ask the officers to turn the squad car around so he could show them where the gun was.  *Id.* at 294-95.  Rejecting Innis's claim that the officers' comments were the "functional equivalent" of express questioning, the Court found that nothing in the record suggested that "the officers were aware that [Innis] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children" or that "the police knew that [Innis] was unusually disoriented or upset at the time of his arrest."  *Id.* at 302-03.

Wand, in his state court appeal, did not cite *Innis*, did not argue that the agents' closing comments on September 8 were the functional equivalent of express questioning, and he did not argue that the officers had reason to know their remarks were reasonably likely to elicit an incriminating response from Wand.  *See* Wand's Appellate Br., dkt. 20-2, at 31.  Wand argued merely that the agents were taking "subtle advantage" of Wand's personal characteristics, *id.*, without saying what those characteristics were, or how the officers were aware of them.  Given Wand's undeveloped argument on this point– which he repeats in this court– I cannot find that the Wisconsin Court of Appeals unreasonably applied *Innis* when it rejected Wand's vague

14

argument on this point.  As *Innis* makes clear, the fact that the officers' parting remarks might have prompted Wand to "stew" overnight was not enough to constitute interrogation. Moreover, as discussed in the next section, the trial court reasonably found that Wand's September 9 statements were voluntary and uncoerced, and that they were sufficiently attenuated from any coercive police conduct that occurred during Wand's September 8 interview.

## D. [There was no] Residual Taint from September 8

As noted above, the trial court found that Wand's September 8 statement was involuntary because agents Sielehr and Montgomery made false promises of leniency, which, viewed in light of Wand's personal characteristics, were coercive.  Wand argues that this coercion carried over to September 9 when he spoke with agents Fernandez and Reimer; therefore, his September 9 statement should have been suppressed as "fruit of the poisonous tree."[1]  *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

But the Supreme Court has held that  confessions obtained after police misconduct may still be admissible if those statements are sufficiently attenuated from the illegality.  *Brown v. Illinois,* 422 U.S. 590, 602 (1975); *Westover v. United States*, decided together with *Miranda v. Arizona*, 384 U.S. 436, 496–97 (1966); *Lyons v. Oklahoma*, 322 U.S. 596 (1944).  Even where

---

[1] On reply, Wand argues for the first time that his arrest on September 8 by Sielehr and Montgomery was unlawful and tainted his subsequent confession because he was not brought before a judicial officer within 48 hours.  *See Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *Gerstein v. Pugh*, 420 U.S. 103 (1975).  Wand did not raise this claim in his petition or initial brief, and therefore he has waived it.  *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("[A]rguments made for the first time in a reply brief are generally treated as waived.").  Moreover, even if not waived, the claim is without merit.  "An illegal arrest . . . is an insufficient ground, standing alone, upon which to vacate a conviction in federal habeas proceedings."  *Sanders v. Israel*, 717 F.2d 422, 432 (7th Cir. 1984) (citing *United States v. Crews*, 445 U.S. 463, 474 (1980), and *Pugh*, 420 U.S. at 119).  Moreover, the September 9 interview took place approximately 16 hours after Wand's arrest, well within the 48-hour time period prescribed by *Pugh*.

police "forced a full confession from the accused through unconscionable methods of interrogation, the Court has assumed that the coercive effect of the confession could, with time, be dissipated." *Oregon v. Elstad*, 470 U.S. 298, 311-12 (1985) (citing *Lyons*, 322 U.S. 596).

To determine whether a confession is tainted by an earlier, involuntary confession, the court considers the temporal proximity between the statements, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 605. Ultimately, "[t]he admissibility of the later confession depends upon the same test—is it voluntary." *Lyons*, 322 U.S. at 603. And while the voluntariness inquiry takes the defendant's characteristics into account, it is analyzed "from the perspective of a reasonable person in the position of the suspect." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001).

In Wand's case, the trial court found "sufficient attenuation, division, separation," between the September 8 and 9 interviews such that any taint arising from the coercive effect of the first interview had dissipated by the time of the second. This conclusion was based on the following: (1) the questioning on September 9 was different and did not involve false promises of leniency; (2) Wand initiated the interrogation; (3) the interrogation took place at a different location with different agents; (4) 16 hours had elapsed between the interrogations, during which Wand had eaten and been allowed to rest; and (5) Wand was re-read his *Miranda* rights and agreed to waive them before he made any statements on September 9.

Wand did not challenge any of these findings in his state court appeal. Instead, Wand argued that "[t]here is absolutely no reason to suppose that those same [promises of leniency made on September 8] did not play into [Wand's] willingness to talk to the agents on

16

September 9th." Wand's Appellate Br., dkt. 20-2, at 30.  Wand pointed to his testimony at the suppression hearing, where he stated  that he believed the promises the agents made to him on September 8, and that that this continued belief motivated him to answer questions the next day.  *Id*.  Finally, Wand suggested that, as a matter of law, because his September 8 confession was involuntary, his September 9 confession was involuntary as well.  *Id*.

The Wisconsin Court of Appeals rejected these arguments.  First, as the court correctly observed and as the cases cited above make clear, there is no merit to Wand's position that the state may *never* use a second confession merely because the first confession was involuntary. Second, the appellate court held that the trial court was not required to credit Wand's testimony about his subjective beliefs when he spoke to the agents on September 9, particularly when Wand did not even bring up the promises of leniency that the other agents had made to him the day before.. Regardless, the question whether a subsequent statement is voluntary and free of any taint arising from earlier police misconduct is analyzed from the perspective of a reasonable person in the position of the suspect, so Wand's subjective motivation was not controlling. Finally, Wand had failed on appeal to challenge the various facts that the trial court cited in support of its finding that Wand's September 9 statement was sufficiently attenuated from his September 8 statement to be untainted.

Under these circumstances, the Wisconsin Court of Appeals did not unreasonably apply federal law in rejecting Wand's argument that his September 9 statement was "tainted" and involuntary as a result of the agents' false promises of leniency on September 8.  As that court noted, the trial court cited a number of facts supporting its conclusion that Wand's September 9 statement was voluntary and untainted by the September 8 interview, but Wand did not

challenge those findings in state court, and he does not challenge them in this court. Although there may be other facts that tilt in Wand's favor, the facts cited by the trial court amply support its conclusion that there was sufficient attenuation between Wand's September 8 and 9 statements so as to purge any taint.

Specifically, given the time that elapsed between the statements, the intervening circumstances, the change in location, the different set of agents, Wand's waiver of his *Miranda* rights, and the fact that he initiated the September 9 contact with law enforcement, it was not outside the bounds of reasonableness for the trial court to conclude that Wand's September 9 statement was not tainted by any misconduct that occurred on September 8, nor was it unreasonable for the Wisconsin Court of Appeals to uphold this determination given Wand's off-target arguments. Because the state courts plainly "took the rule seriously and produce[d] an answer within the range of defensible positions," *Mendiola v. Schomig*, 224 F.3d 589, 591-92 (7th Cir. 2000), Wand is not entitled to federal habeas relief on this aspect of his claim.

## E.  Wand's Characteristics and Police Tactics

Wand next argues that, even absent any taint, his September 9, 2012 statement was coerced in light of his personal characteristics and the conduct of the agents on that date. The Wisconsin Court of Appeals found that Wand had forfeited this argument by "failing at all times" before the circuit court "to identify a single specific tactic, statement, or question of the agents . . . that Wand argued was coercive in light of Wand's personal characteristics." *Wand*, 2016 WI App 80, ¶ 26 (citing *Schill v. Wis. Rapids School Dist.*, 2010 WI 86, ¶ 101, 327 Wis. 2d 572, 617, 786 N.W.2d 177, 200). The appellate court pointed out that Wand had

presented Dr. Berney's testimony at the suppression hearing, but Dr. Berney had not reviewed the interview records and did not offer an opinion about the agents' tactics. *Id*. Moreover, found the court, Wand had failed to develop any argument on appeal about particular conduct by the agents that could have rendered his September 9 statements involuntary in light of his personal characteristics. *Id*. at ¶ 27.

The court noted that Wand appeared to be arguing that the court should reverse the trial court's suppression ruling based on Dr. White's report. *Id*. at ¶ 28. The court explained that although Dr. White's report was relevant to Wand's argument that a "manifest injustice" existed such that he should be permitted to withdraw his plea, it was *not* relevant to the trial court's suppression ruling because the trial court did not have White's report at that time. *Id*. at ¶ 28.[2] Furthermore, found the court, the new evidence did not establish a manifest injustice warranting plea withdrawal because Dr. White's opinion was merely the "newly discovered importance of evidence" known to Wand and his counsel at the time he entered his pleas, namely, the video and transcript of the September 9 interview. Relying on *State v. Fosnow*, 2001 WI App 2, ¶ 25, 240 Wis.2d 699, 624 N.W.2d 883 (2000), the court agreed with the trial court that Dr. White's report was not really "new" evidence but rather was "a second opinion from another expert examining facts that existed at the time of the trial and coming up with a different conclusion." *Wand*, 2016 WI App 80, ¶ 34. Accordingly, the court found that no manifest injustice had occurred that would justify Wand's withdrawal of his guilty plea.

---

[2] The state appellate court did not address Dr. Thompson's report, finding that "it does not differ in any significant respect from the report of [Dr. Berney,] the psychologist who testified at the suppression hearing." *Wand*, 2016 WI App 80, n.3. It did not mention the report from Bieber, the fire examiner.

In this court, as in state court, Wand relies primarily on Dr. White's report as evidence that the agents employed coercive tactics on September 9. *See* Br. in Supp., dkt. 25, at 20-21. As evidence of his suggestibility and the coercion by the agents, Wand highlights the portion of the interview during which the agents questioned how the fire in the living room had grown in the way Wand said it did, to which Wand replied that he had grabbed a gas can and poured gasoline on the fire to get it going.  When the agents later challenged *that* account and asked Wand if he had really grabbed a gas can, Wand replied:  "Not really.  I mean, I don't know what to say.  Because when I said I never did, you guys said that I'm lying."  The agents responded that they just wanted Wand to tell the truth. Wand replied that the truth was that his brother wasn't there and Wand was sleeping when the fire started.  This assertion completely reversed what Wand already had told the agents:  that Wand had come up with the idea of starting the fire and making it look like it had been caused by a new TV, and that Jeremy started several small fires in the living room as Wand watched and handed him paper to get it going.

Wand also highlights various statements by the agents in which they pressed him for details, told him he needed to "wake up" and tell them what happened, and implied that they sympathized with him by suggesting that he had started the fire because of financial stress and to get a "fresh start." Quoting from White's report, Wand  asserts that the agents "worked in tandem, increased the pressure, and relied heavily on standard Reid School techniques: confrontation, minimization, implied leniency, and theme development."[3]  *Id*. at 20.  Wand

---

[3] As the dissent observed in *Dassey*, the Reid Technique "relies heavily on false evidence ploys and other forms of deceit," and was for some time "the most widely used interrogation protocol in the country."  877 F.3d at 320–21(citing Miriam S. Gohara, *A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques*, 33 Fordham Urb. L.J. 791, 808 (2006)).

argues that when these tactics are considered in conjunction with Wand's low IQ, compliant personality, emotional trauma, and lack of sleep between the fire and September 9, they lead to the conclusion that his statements were coerced.

If this court were reviewing Wand's suppression motion in the first instance, then perhaps Wand's arguments (which parrot White's report) would have more traction. But the Circuit Court for Lafayette County already has reviewed the September 9 transcript and found nothing that amounted to coercion or false promises by the agents. Indeed, so far as it appears, even *Wand* didn't argue that the agents employed undue pressure techniques or deceit during that interview. His primary argument in his suppression motion was that his confession was tainted by the agents' promises of leniency the preceding day, amplified by Wand's sleepless night in a jail cell. It wasn't until *after* his plea and sentencing that Wand developed and presented his claim that the agents' tactics on September 9 were coercive. As a result, the court of appeals found that Wand had forfeited the argument.

When a state court declines to address the merits of a state prisoner's constitutional claim based on an independent and adequate state procedural ground, a federal court is generally barred from reviewing the claim in a federal habeas petition. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Such is the case here. Citing state law, the appellate court explicitly stated that it was relying on the forfeiture rule to reject Wand's claim that his September 9 statements were coerced. "Wisconsin appellate courts long have held that failure to advance arguments in the trial court waives the right to present them on appeal." *Greene v. Pollard*, 677 F. Supp. 2d 1073, 1092 (W.D. Wis. 2009) (citing cases). Because the state appellate court rejected Wand's argument based on a state procedural rule that was both independent of the federal question and

21

adequate to support its judgment, this claim is procedurally defaulted, precluding federal habeas review.[4]  Furthermore, although a procedural default may be excused if the petitioner can show both cause for and prejudice from the default, or can demonstrate that the federal court's failure to consider the claim would result in a fundamental miscarriage of justice, *see, e.g., Bolton v. Akpore*, 730 F.3d 685, 696 (7th Cir. 2013), Wand does not invoke either of these exceptions.

Even if this court were to overlook Wand's default, he still would not be entitled to habeas relief.  Wand's challenge is all but foreclosed by the Court of Appeals' *en banc* opinion in *Dassey*, in which the petitioner was subjected to similar interrogation techniques as Wand. Indeed, the court might have been addressing Wand's arguments in this case when it wrote:

> A number of relevant factors, we recognize, tend to support Dassey's claims about the March 1st confession. He was young. He was alone with the police. He was somewhat limited intellectually. The officers' questioning included general assurances of leniency if he told the truth, and Dassey may have believed they promised more than they did. At times it appeared as though Dassey simply did not grasp the gravity of his confession—after confessing to rape and murder, he asked the officers if he would be back at school that afternoon in time to turn in a project. Portions of the questioning also included leading and suggestive questions, and throughout the interrogation Dassey faced follow–up inquiries when the investigators were not satisfied with what he had told them, leading him at times to seem to guess. In addition, the confusion and contradictions in Dassey's account of the crimes of October 31st lend support to the view that his confession was the product of suggestions and/or a desire to tell the police what they wanted to hear.

---

[4] The court of appeals further found that Wand had made "no developed argument about particular conduct of the agents at the September 9 interview that could have rendered his statements involuntary, in light of his personal characteristics."  *Wand*, 2016 WI App 80, ¶ 27. Although this ruling arguably constitutes a second finding of procedural default, it is unnecessary to address it in light of the court's clear forfeiture ruling.

*Dassey*, 877 F.3d at 312.[5]

Even so, the court declined to grant habeas relief, noting that there were "many other factors" that supported the finding that Dassey's confession was voluntary. Notably, Dassey was not in custody; he was given *Miranda* warnings and understood them; he was interviewed during school hours and in a comfortable setting; he showed no signs of physical distress; he had access to food, drinks, and restroom breaks; the officers did not use force, threaten him, or intimidate him; the three-hour interview was not "particularly lengthy;" and Dassey never refused to answer questions, never asked to have counsel or his mother present, and never tried to stop the interview. *Id*. at 306, 312. As for the interrogation techniques, the court observed that it was not coercive to press a subject for more details when his story seems incomplete or dishonest, nor was it coercive to feign prior knowledge about what happened, and the court cited examples to show that Dassey had "not been pushed to provide a false story against his will." *Id*. at 313. The bottom line was that

> the totality–of–the–circumstances test gives courts considerable room for judgment in cases like this one, where the factors point in both directions. Given the many relevant facts and the substantial weight of factors supporting a finding that Dassey's confession was voluntary, the state court's decision was not an unreasonable application of Supreme Court precedent.

> *Id*.

As with Dassey, so with Wand. Here, the factors point in both directions. Factors that support Wand's claim of coercion include his intellectual limitations, his compliant personality,

---

[5] A distinction in Dassey's case is that Dassey went to trial and swore under oath that none of the incriminating events he related in his confession ever happened. *Id*. at 310. Wand has never submitted a sworn disavowal.

and his claimed mental exhaustion while facing his third interview in three days after spending a restless night in jail.  On the other hand, in spite of his mental limitations, Wand is a competent adult who had prior experience with the criminal justice system.  Although he claimed he did not sleep at all between the September 8 and 9 interviews, jail records noted that he appeared to be sleeping at various times throughout the night, and there is no dispute that he had had the opportunity to rest.

Then there are the circumstances of the interview itself.  Wand initiated the contact with the agents on September 9, he understood his *Miranda* rights, and he expressed his willingness to answer questions even after addressing his concerns about Sielehr and Montgomery's parting remarks on September 8.  Despite his professed exhaustion, Wand was able to recount in detail the amounts of his monthly disability checks, monthly bills, amounts owed, and their due dates; he was given three breaks during the interview; and he never told the agents he was tired or that he wanted to end the questioning, something he knew he could do because he had done it the night before with Sielehr and Montgomery.  Finally, Wand makes no claim that the agents made explicit promises of leniency, threatened him, or raised their voices.

As proof of coercion, Wand first notes that thn agents, when encouraging Wand to provide a full confession, mentioned several times their theory that Wand was under tremendous financial stress, and they professed empathy for "what stress does to people."  But Wand does not cite–and this court is not aware of any–Supreme Court case holding that an interrogator's expression of empathy-–even if contrived-–is coercive *per se*.  To the contrary, "the Court has held that officers may deceive suspects through appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff." *Dassey*, 877 F.3d at 304 (citations omitted).

24

*See, e.g., Berghuis v. Thompkins*, 560 U.S. 370, 376, 387 (2010) (question referring to defendant's religious beliefs did not render his statement involuntary).  Nothing the agents said to Wand was specific enough to constitute a false promise of leniency.  *Dassey*, 877 F.3d at 304 (noting that a false promise must be "quite specific" to amount to coercion, citing examples).

Second, Wand cites the portion of the interview where he told the agents that he had lied about grabbing a gas can and pouring gas on the fire and that he actually had been asleep and Jeremy was not there.  Wand now seems to suggest that this exchange demonstrates that his will was overborne because he was simply telling the agents what he thought they wanted to hear.  But this theory does not square with the fact that, when asked early in the same interview to provide an example of something that was wrong, Wand volunteered that it was wrong for him and Jeremy to "take part in" the fire, explaining that he "allowed Jeremy to do it, and I – I did nothing about it."  Thus, Wand *sua sponte* admitted his involvement when the questioning barely had begun, and he proceeded to fill in the details when responding to open-ended questions without any pushing from the agents.

Moreover, Wand denied the agents' suggestion that he had started the *previous* fire in his home or had been inspired by that fire to start the second one.  This counters his claim of suggestibility.  Wand's fabrication about the gas can and his U-turn later during the interview is puzzling, but as *Dassey* makes clear, contradictory accounts are just one factor to consider in the voluntariness analysis.  Moreover, the voluntariness inquiry is not concerned "'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).  In other words, even if Wand subjectively believed that he should tell the agents what

they wanted to hear, that belief does not constitute a ground for suppression unless the agents also engaged in coercion. As noted previously, the fact that the agents challenged Wand's account where it did not make sense or contradicted his previous statements was not, without more, coercive. *Dassey*, 877 F.3d at 313.

In sum, even if Wand had not defaulted his argument that the agents engaged in coercive tactics, Wand still would not be entitled to federal habeas relief. Whether a defendant's statement is voluntary is a general, totality-of-the-circumstances test that affords the state courts significant leeway in reaching an outcome in any given case. Given that there were factors that pointed in both directions (although mostly towards voluntariness), the circuit court did not unreasonably apply this test in determining that Wand's statements were voluntary.

## F. Wand's Claim That His Confession was not "Reliable"

Finally, Wand presents what was the main thrust of his state court post-conviction motion, namely, that his confession was unreliable. As explained in *Dassey*, 877 F.3d at 317-18, habeas relief cannot be granted on this claim because there is no controlling Supreme Court precedent condemning the interrogation techniques used by the agents or requiring that a confession's reliability be considered when deciding whether it must be suppressed under the Due Process Clause. "Absent a clear declaration from the Court, [federal courts] may not create new constitutional restraints on habeas review." *Id*. at 318 (citing *Kernan v. Cuero*, 583 U.S. ——, 138 S. Ct. 4, 9 (2017) (circuit precedent does not satisfy § 2254(d)(1), "[n]or, of course, do state–court decisions, treatises, or law review articles")). Insofar as Wand argues that the state courts should have found that his confession was so unreliable as to constitute a "manifest

26

injustice" that warranted plea withdrawal, he raises only a question of state law that  is not reviewable in a habeas proceeding.  *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004) (federal court can intervene only if state court error deprives petitioner of federal right).

## G.  Certificate of Appealability

As noted above, the facts underlying Wand's claims in his habeas petition point in both directions.  That said, the legal analysis of these claims under § 2254 is straightforward and it leads inexorably to the denial of Wand's petition.

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal."  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Instead, a state prisoner must first obtain a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In deciding whether a certificate of appealability should issue, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Buck*, 137 S. Ct. at 773 (citation and quotation marks omitted).

Further, where a claim is resolved on procedural grounds (such as statute of limitations), a certificate of appealability should issue only if reasonable jurists could disagree about the merits of the underlying constitutional claim *and* about whether the procedural ruling was correct. *Flores-Ramirez v. Foster*, 811 F.3d 861, 865 (7th Cir. 2016).

Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to § 2253(c)(2), I find that no reasonable jurist would find it debatable "whether [this Court] was correct in its procedural ruling" that Wand procedurally defaulted his claim that the agents engaged in coercive tactics during the September 9, 2012 interview by failing to raise that issue before the trial court. I further find that jurists of reason would not deem the issues raised in Wand's petition to warrant further proceedings. Accordingly, I am declining to issue a certificate of appealability.

ORDER

IT IS ORDERED that Armin Wand's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED. The clerk of court shall enter judgment for respondent and close this case. No certificate of appealability shall issue.

Entered this 11th day of August, 2020.

BY THE COURT:

/s

_____

STEPHEN L. CROCKER
Magistrate Judge